UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
**CENTRAL DIVISION at LEXINGTON**

DARRELL LEATH,                    )
                                  )
    Plaintiff,                )          Civil Case No.
                                  )          5:17-cv-38-JMH
v.                                )
                                  )          **MEMORANDUM OPINION & ORDER**
RANDALL WEBB, et al.,             )
                                  )
    Defendants.               )
                                  )
                                  )
                                  )

*** 

While most people were busy celebrating the 2016 New Year, police in Lexington were investigating a homicide. The first shooting victim of the year had arrived at University of Kentucky Chandler Hospital on January 1. And before the sun set on that first day of the year, UK Police learned from Lexington Police that someone connected to the shooting—be it another victim, a suspect, or a witness—could show up at Chandler. So Lexington police asked UK officers to give them the heads up if anything of interest occurred at the hospital. And in the wee morning hours of January 2, 2016, Darrell Leath walked through the door.

Leath, it turned out, was kin to the victim. He told police as much, and he begged them to let him see his cousin. But police couldn't do so—after all, it was against hospital policy, and at the time, officers did not know who Leath was. This didn't sit

well with Leath.  He grew angry and belligerent; police had to ask him to leave.  Leath complied, albeit reluctantly and not without protest.  And as Leath slowly exited UK property, police decided they had grounds to arrest him.  So they put Leath in handcuffs and charged him with several misdemeanors.  What transpired over the next few hours resulted in felony charges, another trip to the hospital, a trial, a conviction on some charges, acquittal on others, and now this civil-rights lawsuit.  Leath claims officers and nurses (1) violated his right to refuse medical treatment, (2) fabricated charges against him, (3) used excessive force, and (4) retaliated against him.  Defendants deny Leath's allegations and argue they enjoy qualified immunity.  So they filed a Motion for Summary Judgment.  [DE 37].  Leath responded [DE 41] and Defendants replied [DE 45], making this matter ripe for review.  For the reasons stated herein, Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART**.

## I. Background

### a. UK Chandler Hospital

Darrell Leath and his father arrived in the lobby of Chandler early on January 2, 2016 hoping to see a family member.  [DE 37-13, McConnell Body Camera Video].  Officer Joshua McConnell was also at Chandler as part of his duties as a UK Police officer.  [DE 37-9, Dep. of Josh McConnell, pp. 18–20].  That night,

Lexington Police asked UKPD to notify them if anyone came into Chandler with information about the recent homicide. [*Id.*].

When Leath walked in and started discussing the shooting, McConnell did not know Leath's relationship with the victim. [*Id.*, p. 20]. So McConnell notified dispatch. [*Id.*]. When he informed Leath that no one could go back to see the victim, Leath was not happy. [*Id.*; DE 37-13; DE 37-14, McConnell Body Camera Video]. By that point, backup had arrived. [DE 37-9, p. 21]. Officers Randall Webb, David Duncan, and Emily Faulkner joined McConnell and warned Leath that if he didn't "calm down here, we are going to ask you to leave." [DE 37-13]. They informed Leath that they had no information, and would try to work with him, but if "you do not lower your voice, you are going to leave or it is criminal trespassing." [*Id.*].

Leath never did calm down. He remained agitated and upset, prompting police to ask Leath to leave. [DE 37-14]. As he walked out, police followed close behind to ensure that Leath did not linger. All the while, Leath yelled profanities and threats including telling his father "if you touch me, I'm stomping you." [DE 37-14]. He also yelled that he "wish[ed] a motherfucker would touch me." [*Id.* at 3:16; DE 37-15, McConnell Body Camera Video at 3:03]. After a few minutes, police suspected Leath or his father intended to drive. [DE 37-2, p. 6]. Because both men appeared

intoxicated, police intervened. One officer can be heard on body camera video saying "if you want a DUI, there it is." [DE 37-15 at 5:07].

That is when police decided to make an arrest. [DE 37-16, McConnell Body Camera Video at 0:23]. Leath complied but continued to shout profanities and made threats regarding a lawsuit. [*Id.* at 0:42]. Police informed Leath that they were arresting him for alcohol intoxication and disorderly conduct. [*Id.*]. Leath's father admitted that Leath was driving and the two had been drinking. [*Id.* at 1:00, 5:25]. With Leath in handcuffs, officers Faulkner and Webb began a routine pat-down. [DE 37-17, Duncan Body Camera Video at 2:02]. When officers told Leath to take his boots off, he refused: "I ain't taking off a motherfucking thing . . . The fuck you mean? You strip search me, you better have a warrant." [*Id* at 2:08]. The profanities and threats continued as Faulkner executed the pat-down. At that point, Officer Webb grabbed Leath around the mouth and throat area and twice said "look at her again like that." [*Id.* at 2:14].

Police then took Leath to the transport wagon. [DE 37-2, p. 6]. Officers claim Leath began resisting and pulled away, causing Officer Webb, who was holding Leath's arm, to feel a pop in his right shoulder and severe pain. [*Id.;* DE 37-6, Dep. of Randall Webb p. 22]. Webb reported his "whole left arm when numb and

tingly" to the point that he could not move it. [DE 37-6, p. 22].
Officers then placed Leath in the transport wagon and took him to
Fayette County Detention Center.

### b. Fayette County Detention Center

When Leath arrived at the detention center, staff nurse Sarah
Rideau attempted to evaluate him. [DE 37-18, Aff. of Sarah Rideau
p. 2; DE 37-2, p. 7]. Her duties required her to observe new
inmates to determine whether they were medically stable enough to
be admitted. [DE 37-18, p. 1]. Rideau claimed Leath was
"agitated, non-compliant, and seemed very disoriented." [*Id*. at
p. 2, ¶5]. Rideau also noticed Leath had large pupils and froth
coming from his mouth. [*Id*. at p. 2]. Taken together, Leath's
appearance and behavior suggested to Rideau that Leath was either
under the influence of dangerous narcotics or suffering from a
serious medical condition. [*Id*.]. Rideau attempted to take
Leath's vital signs to rule these out, but he refused to comply.
[*Id*.]. So Rideau refused to admit Leath to the jail—FCDC could
not accommodate any serious medical condition or narcotics that
could put Leath and others in danger. [*Id*.].

Officers faced a difficult situation: They had an arrestee,
facing multiple charges, and nowhere to put him. Police asked
Leath to let the jail staff take his vital signs. [DE 37-21,
McConnell Body Camera Video at 1:10]. But he still refused. So

police decided to transport Leath to Good Samaritan Hospital; a doctor there could take Leath's vital signs. While officers and Leath waited to leave, Leath continued his barrage of threats, "I'm suing the shit out of y'all" [DE 37-19, McConnell Body Camera Video at 6:19], and he challenged officers to "take these cuffs off and see if you tough." [*Id*. at 5:40]. Leath even tried to bargain with officers: "I can save your job now. Just let me go. Say it's a misunderstanding." [*Id*. at 7:21]. Finally, Leath indicated to police that he had a criminal history, telling police to Google him to see his rap sheet. [*Id*. at 16:33].

Shortly after 4:00 a.m., Leath and officers climbed into the medical transport and headed to Good Samaritan Hospital.

### c. Good Samaritan Hospital

Upon arrival at Good Samaritan, Leath again told officers he did not consent to giving his vital signs. Police told him at least four times to "sit still" and when Leath began resisting officers pleaded with Leath, "you're going to get hurt, man, stop." [DE 37-20, Duncan Body Camera Video at 12:38]. As he had previously, Leath responded with profanity: "fuck you man; I'm going to sue the fuck out of you." [*Id*. at 12:54]. A nurse attempted to take Leath's blood pressure, but Leath continued to resist and he told police he would "kick you in your motherfucking

face." [*Id*. at 13:10]. Police warned Leath that if he kicked an officer "you will be charged with assault." [*Id* at 13:48].

But Leath did not cooperate. Police put Leath on the ground so medical officials could take his vital signs, and Leath began thrashing. Officers placed a pillow under Leath's head and told him to stop fighting. [*Id*. at 14:22; DE 37-23, McConnell Body Camera Video at 2:34]. During the commotion, Officer Duncan yelled that Leath bit him, and Leath repeatedly tells police to "break my neck." [DE 37-20 at 14:37, 15:19]. He also told police he was "ready to act a fool up in this motherfucker." [*Id*. at 15:06], and that he wanted police "to hurt me . . . so I get paid." [*Id*. at 16:22]. A nurse took Leath's vital signs using a finger clip for a pulse, an arm cuff for blood pressure, and a head-swipe thermometer. No blood was drawn. No drugs were used. No operation performed. The process lasted only a few minutes.

Once the nurse had obtained Leath's vital signs, Leath noticed his boot came off and told police "put my motherfucking shit on before I kick you." [*Id*. at 16:34; DE 37-23 at 4:15]. Police told Leath he was "going shoeless to jail" because he had kicked people. [DE 37-23 at 5:43]. Leath was then cleared to go to jail. [*Id*. at 7:55].

### d. Return to Fayette County Detention Center

Back at FCDC, Leath remained upset.  He told officers that he
was going to "find you" and mouthed that he was going to "shoot
you in the face" to officers.  [DE 37-25, McConnell Body Camera
Video at 2:11].  Officers then discussed the situation with jail
personnel who reiterated that they were not permitted to take Leath
into custody without vital signs.  [*Id.* at 12:19].  But since
vitals had been obtained, Leath was admitted and officials kept
close observation on him based on concerns for his safety.  [DE
37-18, p. 3].

### e. Criminal Proceedings

In addition to the prior misdemeanor charges, police added
three felony assault counts against Leath for (1) pulling away
from Officer Webb, (2) biting Officer Duncan, and (3) kicking
officers at Good Samaritan.  [DE 37-28].  A grand jury indicted
Leath on those charges.  [*Id.*].  At trial, a jury found him not
guilty on the assault charges but guilty on three misdemeanor
charges.  [DE 37-29].  Because Leath could not make bail, he was
held in jail before trial and sentenced to time served following
his conviction.  [*Id.*].

### f. Leath Sues Officers

Leath filed this lawsuit in Fayette Circuit Court in January
2017 alleging a range of constitutional and state-law violations
against UKPD officers Webb, Duncan, Faulkner, McConnell, and

Flora, as well as Good Samaritan nurses Christopher Thompson and Jeffrey Jones-Ritzler. [*Id*.]. Defendants timely removed the case to this court. [DE 1]. After discovery, Defendants filed a Motion for Summary Judgment. [DE 37]. Leath responded [DE 41], and Defendants replied [DE 45], making this matter ripe for review.

## II. Standard of Review

Summary judgment is appropriate only when no genuine dispute exists as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden to show that "there is an absence of evidence to support the nonmoving party's case." *Celeotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 825 (6th Cir. 2013) (internal quotations omitted). The Court construes the facts in the light most favorable to the nonmoving party. *See Anderson v. Liberty Lobby Inc*. 477 U.S. 242, 248 (1986). "In the qualified immunity context, this usually means adopting . . . the plaintiff's version of the facts, unless the plaintiff's version is blatantly contradicted by the record, so that no reasonable jury could believe it." *Stoudemire v. Mich. Dep't of Corrs.*, 705 F.3d 560, 565 (6th Cir. 2013) (internal quotations and citations omitted). Once the moving party meets

its burden of production, the nonmoving party must "go beyond the pleadings" through affidavits, depositions, answers to interrogatories and admissions on file to show a genuine issue exists for trial. *See Celeotex*, 477 U.S. at 323–24. A mere scintilla of evidence is insufficient. *Anderson*, 477 U.S. at 252.

Where "there is 'a videotape capturing the events in question,' the court must 'view[] the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378–81 (2007)). So, "[a]lthough ordinarily the plaintiffs' version of the facts must be accepted as true when deciding the defendant's motion for summary judgment, a video that contradicts a nonmovant's version of the facts can support a grant of summary judgment." *Lee v. City of Norwalk*, 529 F. App'x 778, 782 (6th Cir. 2013).

### III. Analysis

As an initial matter, the Court notes that Leath has withdrawn Count IX (false arrest) against all defendants. [DE 41, p. 4]. Leath also no longer wishes to pursue any claims against Jones-Ritzler. [*Id*. at p. 3]. Accordingly, Defendants' Motion for Summary Judgment is **GRANTED** as to all Defendants on Count IX. The Court also **GRANTS** Summary Judgment to Jones-Ritzler on all counts. The Court now turns to the remaining claims.

Leath's federal claims brought under 42 U.S.C. § 1983 are: (1) Count I: Unlawful Search and Seizure; (2) Count II: Unlawful Detention and Confinement; (3) Count III: Excessive Force; (4) Count VIII: Malicious Prosecution; and (5) Count X: Free Speech. [DE 1]. The state-law claims are: (1) Count IV: Assault; (2) Count V: Battery; (3) Count VI: Abuse of Process; (4) Count VII: Malicious Prosecution.

Because this case involves nine counts against multiple defendants, the Court will address the claims in related groups. And because Defendants invoke qualified immunity as a defense, the Court will first discuss the qualified-immunity standard.

## A. Qualified Immunity

"Qualified immunity operates 'to ensure that before they are subjected to suit, officers are on notice their conduct is unlawful.'" *Occupy Nashville v. Haslam*, 769 F.3d 434, 441 (6th Cir. 2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Stanton v. Sims*, 134 S.Ct. 3, 5 (2013) (per curiam).

Qualified immunity turns on a two-part test: "whether 'a constitutional right would have been violated on the facts alleged' and, if so, whether the right was 'clearly established.'" *Occupy*

*Nashville*, 769 F.3d at 442 (quoting *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001)). Courts have discretion to address either prong of the analysis first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). But as the Supreme Court recently stressed "lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim.'" *Dist. of Columbia v. Wesby*, 138 S.Ct. 577, 589 n.7 (2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)). "Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to immunity." *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010).

Plaintiffs can satisfy the clearly established prong by "citing to 'cases of controlling authority in their jurisdiction at the time of the incident' or 'a consensus of cases of persuasive authority such that a reasonable officer could not have believed that his actions were lawful.'" *Scott v. Becher*, No. 17-2146, 2018 WL 2684316, at *1 (6th Cir. June 5, 2018) (quoting *Wilson v. Layne*, 526 U.S. 603, 617 (1999)); *Kent v. Oakland Cty.*, 810 F.3d 384, 395 (6th Cir. 2016)). In other words, the law is clearly established when "at the time of the officer's conduct, the law was 'sufficiently clear that every reasonable official would understand that what he is doing is unlawful.'" *Wesby*, 138 S.Ct.at 589 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741

(2011)). In evaluating whether a right is clearly established, courts cannot "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. Instead, "[t]he 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S.Ct. at 590. The officer's conduct must be unlawful not in the abstract but "in the situation he confronted." *Id*.

### B. Group One: Unlawful Search and Seizure

In Count I, Leath alleges that the officers and a nurse violated his Fourth Amendment right to be free from an unlawful search and seizure. [DE 41, p. 3]. Specifically, Leath asserts this claim against officers Webb, McConnell, Duncan, and Flora, and nurse Thompson. [*Id*.]. He argues that the taking of his blood pressure, pulse, and temperature violated his rights because (1) it was done with no medical purpose or probable cause, and (2) Leath had a right to refuse medical treatment.

The basis for this claim began when Leath arrived at Fayette County Detention Center and refused to have his vitals taken. [37-18, p. 2, ¶9; DE 37-19, at 3:43]. Sarah Rideau, the nurse at the jail that night, stated in her affidavit that she routinely had to determine if individuals were medically stable enough to be admitted. [DE 37-18 at ¶3]. As discussed above, multiple factors

led Rideau to believe that Leath was extremely intoxicated or suffering from a serious medical condition. [*Id.* at p. 2]. Leath was disoriented, non-compliant, had large pupils, and froth was coming from his mouth. [*Id.* at ¶¶6–7]. Determining the cause of Leath's symptoms was important because the jail might not have "been able to accommodate an immediate medical emergency." [*Id.* at ¶14]. But Rideau could not even begin to evaluate Leath because he refused to comply.

That put officers in a bind. They had Leath in custody but could not admit him to jail. Sensing the problem, Leath sought to capitalize and made a proposal: If the officers let him go scot-free, he would forget about his plans to sue (by this point, Leath had indicated numerous times that he was going to sue officers). [DE 37-19, at 1:21, 4:46, 6:19, 7:21, 9:31, 12:52, 14:34]. Officers had none of it. Instead, they decided that they had to obtain Leath's vitals to comply with jail policy.

That's when an ambulance took Leath to Good Samaritan. There, officers held him down while nurse Thompson swiped Leath's head for a body temperature, took his blood pressure, and used a finger clip for his pulse. [DE 37-22; DE 37-23]. And taking a prisoner's vital signs is nothing new at Good Samaritan. Allison Rains, a doctor who was working that night, stated in a sworn affidavit that it was common for police to bring intoxicated people to the

emergency room to be medically cleared prior to going to jail. [DE 37-22, p. 1, ¶2]. Doing so rules out any preexisting condition or other serious injury. [*Id.* at ¶3]. Indeed, it did so in Leath's case, and he was later admitted to jail. [DE 37-18, p. 3, ¶16].

Leath maintains that he has a "fundamental liberty interest under the Fourteenth Amendment to reuse any medical care or treatment." [DE 41, p. 27]. As support, Leath cites *Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261 (1990) in which the Supreme Court held that "a competent person has a constitutionally protected liberty interest in refusing unwanted medical treatment." *Id.* at 278. *Cruzan*, he argues, gave officers fair warning of his right to refuse. Leath refused, and his right was not honored. Case closed.

Not exactly. Even Leath admits that courts have "found that it is constitutionally permissible to seize a person and transport them to the hospital when the person seized is a danger to themselves or others." [DE 41, p. 27]. Precisely. The entire point of taking Leath's vitals was to rule out a serious medical condition. [DE 37-18 at ¶7]. And Leath had been so volatile and belligerent that jail officials kept him under observation even after taking his vitals. [*Id.* at ¶16].

That's not all.  The Sixth Circuit and other federal courts have held that the right to refuse medical treatment "is not absolute and is particularly susceptible to regulation in the prison setting." *Davis v. Agosto*, 89 F. App'x 523, 528 (6th Cir. 2004).  In *Davis*, for example, officials restrained a prisoner to close a wound on his head, even though he did not consent.  *Id*. at 525.  The Sixth Circuit found that it "was well within the authority of the medical officials at the prison to determine that closing the wound was necessary to the health and safety of Davis as well as those around him."  *Id*. at 528.  The "routine, one-time, medically-necessary procedure" did not violate Davis's rights.  *Id.; see also Myers v. Jackson*, No. 11-3168-SAC, 2012 WL 137935, at *4 (D. Kan. Jan. 18, 2012) (holding plaintiff "presents neither compelling factual circumstances nor convincing legal authority establishing that he had a federal constitutional right to refuse to submit to a simple, one-time, diagnostic blood test.").

*Cruzan* itself does not go as far as Leath would like.  There, the Court recognized that whether a constitutional right has been violated "'must be determined by balancing his liberty interests against the relevant state interests.'"  497 U.S. at 279 (quoting *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982)).  Courts have found that "the state has a substantial interest in assuring the medical stability of its pretrial detainees."  *Sullivan v. Bornemann*, 384

F.3d 372, 378 (7th Cir. 2004).  In *Sullivan*, the Seventh Circuit found no Fourth Amendment violation when officers held down a pretrial detainee who did not consent to a catheter; officers did so because the state jail would not admit the detainee without medical clearance.  *See id*. at 373–75.  The Court found that there is "no rule to the effect that law enforcement officials are constitutionally prohibited from briefly restraining a detainee at the direction of qualified medical personnel."  *Id*. at 377.  A district court within the Sixth Circuit has also concluded that officers did not violate the Fourth Amendment by restraining a detainee who did not consent to a catheterization procedure.  *See Meyer v. Woodward*, 617 F.Supp.2d 554, 562–64 (E.D. Mich. 2008).  Other courts have reached similar conclusions.  *See Russell v. Richards*, 384 F.3d 444, 448 (7th Cir. 2004) (finding that involuntary application of delousing shampoo to new inmates permissible); *Solvin v. Capello*, No. 2:10-cv-297, 2012 WL 1190174, at *5 (W.D. Mich. Apr. 9, 2012) (holding a forced blood-pressure and weight check did not violate rights of prisoner engaged in hunger strike); *Williams v. Brann*, No. 02-C-940, 2006 WL 2401112, at *7–8  (E.D. Wisc. Aug. 18, 2006) (restraining detainee to facilitate rectal exam did not violate Fourth Amendment).

    Like   the   officers   in   *Sullivan*,   here  officers   simply restrained   the   detainee   (Leath)   to   medically   clear   him   for admittance  to  jail.    They  did  so  at  the  direction  of  medical

professionals, and like the treatment in *Davis*, here the blood pressure, temperature, and pulse check was necessary to ensure the safety of Leath and those around him. 89 F. App'x at 528. Rideau said as much in her affidavit, which remains uncontroverted—Leath does not even address Rideau's affidavit in his response to Defendants' motion. The one-time tests were minimally invasive, necessary, and done in jail where the right to refuse is "particularly susceptible to regulation." *Id*. at 525; *Sullivan*, 384 F.3d at 378. In short, Leath did not, as he claims, have an absolute right to refuse. That right had to be balanced with the state's interest. *Cruzan*, 479 U.S. at 279. And balancing those interests in a jail setting—where the state has a heightened interest in ensuring safety—the Court finds no constitutional violation.

But even if a constitutional violation occurred, it was far from clearly established. Leath's arguments fail for two reasons. First, his claim would require defining his clearly established rights at a high level of generality—the right to refuse *any* medical treatment in *any* context. *See al-Kidd*, 563 U.S. at 724. But this is precisely what the Supreme Court has warned against: "[t]he 'clearly established' standard . . . requires that the legal principle clearly prohibit the officer's conduct *in the particular circumstances before him*." *Wesby*, 138 S.Ct. at 590 (emphasis added). Leath does not even attempt to explain how acquiring

minimally invasive vital signs—in a jail setting, from a hostile and intoxicated detainee, who could be a danger to himself and others—violates clearly established rights.  In short, Leath fails to establish that the officers' conduct was unlawful "*in the situation* [they] confronted." *Id.* (emphasis added).

Second, no case that Leath cites controls the situation before the court, and none establishes that "*every* reasonable official would understand that what he is doing is unlawful." *Wesby*, 138 S.Ct. at 589 (emphasis added).  Several cases suggest that restraining a detainee for medical purposes does not violate the Constitution.  *See Sullivan* 384 F.3d 372; *Davis*, 89 F. App'x 523. Indeed, other cases involve medical treatment far more invasive than what Leath endured.  In short, the case law governing detainee and prisoner medical treatment is not so clear as to establish that *every* reasonable officer would "understand that what he is doing violates" Leath's rights.  *See Binay*, 610 F.3d at 646–47. The officers and nurses did not have "fair warning" that their actions would violate a clearly established constitutional right, and they are entitled to qualified immunity.  *See Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015).

Defendants' Motion for Summary Judgment is **GRANTED** as to Count I.

### C. Group Two: Leath's Prosecution and Confinement

The following claims are brought against officers Webb, Duncan, and McConnell for "bringing the false felony assault charges against the Plaintiff which resulted in this prosecution, detention, and confinement:" (1) Count II: Unlawful Detention and Confinement; (2) Count VI Abuse of Process: (3) Count VII State Malicious Prosecution; (4) Count VIII: Federal Malicious Prosecution. Leath also includes Officer Faulkner in Counts VII and VIII. [DE 41, p. 4].

### (i) Federal Malicious Prosecution

"Individuals have a clearly established Fourth Amendment right to be free from malicious prosecution." *King v. Harwood*, 852 F.3d 568, 582–83 (6th Cir. 2017). A § 1983 malicious prosecution claim "encompasses investigation, prosecution, conviction, and incarceration." *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). Malicious prosecution contains four elements: "(1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was a lack of probable cause for the criminal prosecution; (3) the plaintiff suffered a deprivation of liberty, as understood under Fourth Amendment jurisprudence, apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *King*, 852 F.3d at 580. Defendants argue that Leath fails to meet element two because

probable cause existed to prosecute Leath on the felony assault charges.

### (a)    *Probable Cause*

"Probable cause to initiate criminal prosecutions exists where facts and circumstances are sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *Webb v. United States*, 789 F.3d 647, 666 (6th Cir. 2015). In a malicious prosecution case, a grand-jury indictment presumptively establishes probable cause. *See King*, 852 F.3d at 586-87. But a *tainted* grand-jury indictment cannot provide a basis for probable cause. *See Manuel v. City of Joliet*, 137 S.Ct. 911, 920 n.8 (2017). In the Sixth Circuit, a plaintiff can rebut the probable-cause presumption when:

> (1) a law-enforcement officer, in the course of setting a prosecution in motion, either knowingly or recklessly makes false statements (such as in affidavits or investigative reports) or falsifies or fabricates evidence; (2) the false statements and evidence, together with any concomitant misleading omissions, are material to the ultimate prosecution of the plaintiff; and (3) the false statements, evidence, and omissions do not consist solely of grand-jury testimony or preparation for that testimony (where preparation has a meaning broad enough to encompass conspiring to commit perjury before the grand jury).

*King*, 852 F.3d at 587-88.

Here, a grand jury indicted Leath on the felony assault charges, meaning the grand jury already determined that probable cause existed. [DE 37-28]. Leath bears the burden of rebutting the presumption under *King*. 852 F.3d at 587–88.

He has not done so.

Leath attempts to show a lack of probable cause several ways. First, Leath points out that he was acquitted on the felony assault charges. [DE 41, p. 18]. True, but that has little relevance here where the question is whether probable cause existed, not whether the state proved its case beyond a reasonable doubt. After all, "'[b]ecause there is no requirement that the defendant to a malicious-prosecution charge must have evidence that will ensure a conviction, not every failed criminal prosecution will sustain a subsequent malicious-prosecution suit.'" *Bickerstaff v. Lucarelli*, 830 F.3d 388, 397 (6th Cir. 2016) (quoting *Harris v. United States*, 422 F.3d 322, 327 (6th Cir. 2005)).

Next, Leath presents his own affidavit in which he swears he did not assault Officer Webb. [DE 41-6]. But the affidavit addresses only one of the three felony counts. Leath does not even mention the incident at Good Samaritan—where officers claimed two of the alleged assaults occurred. Thus, as to the alleged assaults involving Officers Duncan and McConnell, Leath's affidavit has no effect. And as to Webb, Leath merely denies he

assaulted Webb. Denying he assaulted Webb does not amount to establishing that no probable cause existed.

And in any event, Leath presents nothing that satisfies the *King* standard. After all, the statute under which Leath was charged requires only an "*attempt*[] to cause physical injury to" an officer. KRS § 508.025. Leath's denial does not suggest that Webb did not have reason to believe Leath attempted to cause physical injury. And Leath does not provide any other evidence that police fabricated or falsified evidence. *See King*, 853 F.3d at 587–88. Leath cannot rebut the probable-cause presumption merely by denying the assault.

The video evidence also contains nothing to suggest officers made false reports or fabricated evidence. To the contrary, the video supports the inference that officers believed Leath assaulted them. For example, at Good Samaritan, Officer Duncan *immediately* claimed Leath bit him. [DE 37-20, at 14:37]. Duncan repeated it throughout the video. Officers warned Leath that if he kicked someone, he would be charged with assault. [DE 37-23, at 0:32]. Officer McConnell then reported that Leath kicked him. [*Id.* at 5:16, 5:43]. And during the altercation, Leath himself said "I'm about to act a fool up in this motherfucker" and "put my motherfucking shit on before I kick you." [DE 37-20 at 15:06, 17:34]. Leath's threats, coupled with the officers' instant

reaction suggest officers did in fact believe Leath assaulted them. Thus, the video does not rebut the *King* presumption because "the video does not support the inference that the officers made knowingly or recklessly false statements." *Williams v. Schismenos*, No. 17-3786, 2018 WL 2999738, at *5 (6th Cir. June 13, 2018). And *no* evidence supports what Leath needs to rebut *King*: a knowing or reckless false statement or fabricated evidence. In sum, the grand jury's probable-cause finding resolves Leath's claim. Because he cannot rebut the presumption, he cannot maintain his claim. Thus, summary judgment is **GRANTED** to defendants on Count VIII.

### *(ii) State Malicious Prosecution*

In Count VII, Leath makes a state malicious prosecution claim. The elements in Kentucky are: "1) the defendant initiated, continued, or procured a criminal or civil judicial proceeding, or an administrative disciplinary proceeding against the plaintiff; 2) the defendant acted without probable cause; 3) the defendant acted with malice, which in the criminal context, means seeking to achieve a purpose other than brining an offender to justice; and in the civil context, means seeking to achieve a purpose other than the proper adjudication of the claim upon which the underlying proceeding was based; 4) the proceeding, except in ex parte civil actions, terminated in favor of the person against whom it was

brought; and 5) the plaintiff suffered damages as a result of the proceeding." *Martin v. O'Daniel*, 507 S.W.3d 1, 11–12 (Ky. 2016).

Thus, like his federal claim, Leath must show a lack of probable cause. Also like his federal claim, Leath cannot do so because in Kentucky "where there is a specific finding of probable cause in the underlying criminal action . . . a malicious prosecution action cannot be maintained." *Broaddus v. Campbell*, 911 S.W.2d 281, 283 (Ky. Ct. App. 1995); *see also Davidson v. Castner-Knott Dry Goods Co*, 202 S.W.3d 597, 607 (Ky. Ct. App. 2006) (finding a grand jury indictment establishes probable cause). Because Leath fails to rebut the grand-jury indictment on probable cause, this claim also fails, and summary judgment is **GRANTED** to defendants on count VII.

### (iii)    *Abuse of Process*

Count VI alleges abuse of process under Kentucky law. A plaintiff may pursue abuse of process claims against "one who uses a legal process, whether criminal or civil, against another primarily to accomplish a purpose for which that process is not designed." *Sprint Commc's Co. v. Legget*, 307 S.W.3d 109, 113 (Ky. 2010) (citing Restatement (Second) of Torts § 682 (1977)). Abuse of process requires: "(1) an ulterior purpose and (2) a willful act in the use of the process not proper in the regular conduct of the proceeding." *Simpson v. Laytart*, 962 S.W.2d 392, 394 (Ky.

1998). A plaintiff must show that defendants engaged in some "definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process." *Id*. "[T]he gist of the tort is not commencing an action or causing process to issue without justification, but misusing or misapplying process justified in itself for an end other than that which it was designed to accomplish. The purpose for which the process is used, once it is issued, is the only thing of importance." *Flynn v. Songer,* 399 S.W.2d 491, 494 (Ky.1966) (quoting Prosser, *Law of Torts* § 115 (3d ed.1964)). In essence, abuse of process involves "a form of extortion, and it is what is done in the course of negotiation, rather than the issuance of any formal use of the process itself, which constitutes the tort." *Simpson v. Laytart*, 962 S.W.2d 392, 395 (Ky. 1998). "[T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion even if we assume *arguendo* bad intentions." *Id*.

Here, Leath makes no claim—and presents no evidence—that the charges against him were used for non-legitimate purposes. Leath argues that the record contains "evidence from which a jury could conclude that the Defendant Officers were not acting for the purpose of ensuring justice and deliberately brought false charges against the Plaintiff must be sufficient to infer that they had an ulterior motive or improper purpose." [DE 41, p. 23]. But even

assuming that the officers had bad intentions and brought false charges, they are not subject to liability unless they used the process for something *outside* the criminal process. *See Simpson*, 962 S.W.2d at 395; *Mullins v. Richards*, 705 S.W.2d 951, 952 (Ky. Ct. App. 1986). A defendant does not commit abuse of process for the "formal use of the process itself." *Simpson*, 962 S.W.2d at 395. There was no extortion-like negotiation in which the officers used the charges as leverage against Leath. *Id*. Merely carrying out criminal charges against a defendant—even when the officers have bad intentions—is not an abuse of process. *See Madden v. Calvert*, 2017 WL 4366746, at *7 (W.D. Ky. Sept. 29, 2017); *Grise v. Allen*, 2016 WL 1261077, at *9 (E.D. Ky. Mar. 30, 2016); *Simpson*, 962 S.W.2d at 394.

Thus, Leath's abuse of process claim fails and summary judgment is **GRANTED** to defendants on Count VI.

### *(iv) Unlawful Detention and Confinement*

In Count II, Leath alleges he was detained without probable cause in violation of the Fourth Amendment. [DE 41, p. 4]. Leath argues that the felony assault charges caused him to be detained from the date of his initial appearance through the date of his acquittal—about 310 days. [*Id*.].

"The Fourth Amendment prohibits government officials from detaining a person in the absence of probable cause." *Manuel*, 137

S.Ct. at 918.  This applies "even beyond the start of legal process." *Id.* at 920.  Although a grand jury or judge can determine probable cause, those findings do not extinguish a Fourth Amendment claim if the process is tainted by, for example, false testimony or fabricated evidence.  *Id.* at 920, n. 8.

But as already discussed, the grand jury found probable cause in this case, and Leath has presented no evidence to question that determination.  No record evidence suggests that the grand jury's finding of probable cause was tainted.

Thus, Leath's unlawful detention claim fails and summary judgment is **GRANTED** to defendants on Count II.

### D. Group Three: Excessive Force, Battery, Assault

The third group involves three claims: (1) Count III: Excessive Force; (2) Count IV State-Law Assault; (3) Count V: State-Law Battery.  [DE 41, p. 4].  Leath asserts these against (1) officer Webb for allegedly grabbing Leath around the throat and jerking his head during the initial arrest, and (2) officers Webb, McConnell, Duncan, and Flora, and nurse Thompson, for their alleged actions at Good Samaritan while restraining Leath to take his vital signs.  [*Id.*].

#### *(i)  Excessive Force*

Excessive force claims can fall under the Fourth Amendment or Fourteenth Amendment. *See Coley v. Lucas Cty.*, 799 F.3d 530, 537 (6th Cir. 2015). The Fourth Amendment governs "a free citizen in the process of being arrested or seized," and the Fourteenth Amendment governs claims from a person between a free person and a convicted prison; i.e., "someone in 'gray area[s]' around the two." *Id.* (alterations in original). Under the Fourth Amendment, courts ask whether the force used was objectively reasonable under the circumstances. *See id.; see also Graham v. Connor*, 490 U.S. 386, 396 (1989). The "Fourth Amendment protections extend through police booking until the completion of a probable cause hearing." *Coley*, 799 F.3d at 537 (citing *Aldini v. Johnson*, 609 F.3d 858, 866-67 (6th Cir. 2010)). Here, the excessive force claims come before any probable cause hearing. Thus, the Fourth Amendment's protections apply to Leath. *See Aldini*, 609 F.3d at 866-67.

"In order to comply with the Fourth Amendment, an officer's use of force must be objectively reasonable under the totality of the circumstances." *Smith v. City of Troy*, 874 F.3d 938, 943 (6th Cir. 2017). "In evaluating whether a police officer used excessive force on a particular occasion, the court must view the situation from the perspective of a reasonable officer on the scene at the time and without the benefit of 20/20 hindsight." *Id.* at 943-44. The "calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second

judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Courts balance the "nature and quality of the intrusion on [plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Steicher*, 434 F.3d 461, 466–67 (6th Cir. 2006). Three factors direct the analysis: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Burgess v. Fischer*, 735 F.3d 462, 472–73 (6th Cir. 2013). These factors "do not constitute an exhaustive list; the ultimate question is 'whether the totality of the circumstances justifies a particular sort of seizure.'" *Ciminillo*, 434 F.3d at 467 (quoting *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of judge's chambers,' violates the Fourth Amendment." *Graham*, 490 U.S. at 396 (1989) (quoting *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)).

**a. Webb's Throat Grab**

Leath first claims Officer Webb used excessive force when he grabbed Leath's throat and mouth area shortly after arresting Leath outside of Chandler. [DE 1-1, pp. 9–10]. Body camera footage

from Officer Duncan shows Leath cursing and agitated, but he was not resisting officers. [DE 37-17]. While Officer Faulkner searched Leath, Leath began to yell profanities at her and other officers. [*Id*. at 2:06]. Webb then grabbed Leath around the neck and mouth area and twice said "look at her again like that." [*Id*. at 2:15].

Webb argues that qualified immunity bars Leath's claim. He alleges that he placed his hand over Leath's mouth and moved Leath's face "in an effort to prevent Leath from biting or spitting on Officer Faulkner." [DE 37, p. 21]. Leath argues that Webb had no reason to believe Leath would bite or spit on Faulkner and that Webb's comment "look at her again like that" suggests that Webb grabbed Leath because Webb did not like how Leath eyeballed Faulkner.

Webb does not enjoy qualified immunity on this claim. It is clearly established that officers may not use gratuitous force against subdued suspects who pose no threats to officers. *See Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 852 (6th Cir. 2016); *Baker v. City of Hamilton*, 471 F.3d 601, 607 (6th Cir. 2006) ("we have held repeatedly that the use of force after a suspect has been incapacitated or neutralized is excessive as a matter of law."). In addition, "a plaintiff may 'allege use of excessive force even where the physical contact between the parties did not

leave excessive marks or cause extensive physical damages.'"
*Miller v. Sanilac Cty.*, 606 F.3d 240, 252 (6th Cir. 2010) (quoting
*Morrison v. Bd. of Tr. of Green Twp.*, 583 F.3d 394, 407 (6th Cir.
2009)).

In *Pigram ex rel. Pigram v. Chaudoin*, 199 F. App'x 509, 513
(6th Cir. 2006), a police officer slapped an arrestee in the face
after the arrestee was in handcuffs. *Id*. The Court found that "a
slap to the face of a handcuffed suspect—even a verbally unruly
suspect—is not a reasonable means of achieving anything more than
perhaps further antagonizing or humiliating suspect." *Id*. And in
*Morrison*, the Sixth Circuit denied qualified immunity to officers
who pushed the plaintiff's face while she was already handcuffed.
583 F.3d at 407. "Such antagonizing and humiliating conduct is
unreasonable under the Fourth Amendment, regardless of the
existence of injury." *Id*. (internal quotations omitted). In
short, "[i]t is well established in this circuit that the
gratuitous use of force on a suspect who has already been subdued
and placed in handcuffs is unconstitutional." *Bultema v. Benzie
Cty.*, 146 F. App'x 28, 35 (6th Cir. 2005).

As in *Pigram*, so here. Leath was neutralized, and Defendants
have presented no evidence that Leath presented a danger to
Faulkner or Webb. Because officers have "fair warning" that using
force against a subdued suspect violates clearly established

constitutional law, qualified immunity cannot bar Leath's claim against Webb. *See Baynes*, 799 F.3d at 612–13; *Bultema*, 146 F. App'x at 35. Whether Webb grabbed Leath to prevent him from spitting on or biting Faulkner will be up to a jury. Thus, Defendants' Motion for Summary Judgment on Count III against Officer Webb for grabbing Leath's neck, mouth, and throat area is **DENIED**.

### b. Restraint at Good Samaritan

Leath also makes an excessive force claim against multiple defendants for the incident at Good Samaritan. He argues that the officers used excessive force when they restrained him so that a nurse could take his blood pressure, pulse, and temperature. [DE 41, p. 30].

Although this claim and Count I (unreasonable search and seizure) are both based on the same incident, the two claims are distinct. Count I challenges whether Defendants violated Leath's Fourth Amendment rights by restraining him and taking his vital signs. Here, the *force* officers used is the relevant factor, regardless of whether the officers' actions constituted an unlawful search or seizure. *See Cty. of Los Angeles v. Mendez*, 137 S.Ct. 1539, 1547 (2017). "*The* framework for analyzing excessive force claims is set out in *Graham*." *Id.* (emphasis in original). "If there is no excessive force claim under *Graham*,

there is no excessive force claim at all. To the extent that a plaintiff has other Fourth Amendment claims, they should be analyzed separately." *Id*. "We do not scrutinize whether it was reasonable for the officer to create the circumstances" when analyzing an excessive force claim. *Thomas v. City of Columbus*, 854 F.3d 361, 365 (6th Cir. 2017). "We consider the officer's reasonableness under the circumstances he faced at the time he decided to use the force." *Id*. at 365.

The distinction matters here because, at numerous points, Leath rests his excessive force claim on the fact that he had a right to refuse treatment. [DE 41, pp. 30–33]. But that argument cannot provide the basis for Count III because excessive force is "not a claim that an officer used reasonable force after committing a distinct Fourth Amendment violation." *Mendez*, 137 S.Ct. at 1547. The question is *only* whether an officer used force justified under the circumstances—not whether the force flowed from a *previous* constitutional violation. *See id*.

Thus, in analyzing Leath's excessive force claim, the Court will consider (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether he was actively resisting arrest or attempting to evade arrest by flight. *Burgess*, 735 F.3d at 472–73; *Graham*, 490 U.S. at 396. Defendants argue that they are

entitled to qualified immunity because (1) the force did not amount to a constitutional violation under *Graham*, and (2) any possible violation was not clearly established. The Court first considers whether the force violated Leath's constitutional rights.

At the time Leath and officers arrived at Good Samaritan, Leath was handcuffed. And once an arrestee is subdued, officers are limited in the amount of force they may use. *See Kulpa v. Cantea*, 708 F. App'x 846, 851–52 (6th Cir. 2017); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004). When a suspect is neutralized, any *gratuitous* force is unconstitutional. *Bultema*, 146 F. App'x at 35. This applies to any *non-resisting* individual, *see Brown v. Lewis*, 779 F.3d 401, 419 (6th Cir. 2015), and "even if some level of passive resistance is presented." *Meirthew v. Amore*, 417 F. App'x 494, 499 (6th Cir. 2011).

But handcuffing alone does not prevent a suspect from resisting or posing a threat to officers. Active resistance includes "some outward manifestation—either *verbal or physical*—on the part of the suspect had suggested *volitional and conscious defiance*." *Eldridge v. City of Warren*, 533 F. App'x 529, 533–34 (6th Cir. 2013) (emphasis added); *see also Cockrell v. City of Cincinnati*, 468 F. App'x 491, 495 (6th Cir. 2012) (active resistance can include "physically struggling with, threatening,

or disobeying officers."). "At some point, in response to defiance and belligerence, officers are entitled to 'preserve internal order and discipline.'" *Hanson v. Madison Cty. Det. Ctr.*, No. 17-5209, 2018 WL 2324252, at *9 (6th Cir. May 22, 2018) (quoting *Bel v. Wolfishl*, 441 U.S 520, 547 (1979)). In short, the amount of force an officer uses cannot be detached from the situation; circumstances matter. And handcuffing is only one factor in determining whether a suspect is resisting.

Here, then, as with all excessive force claims, the Court considers context. *See Thomas*, 854 F.3d at 365. Before going to Good Samaritan, Leath indicated to officers that he had killed people before. [DE 37-19 at 16:33]. Body camera footage shows Leath telling officers to Google him to see his rap sheet. He taunted officers by saying "you ain't got no bodies under your belt." [*Id.*]. Leath also challenged officers several times and told officers to "take these cuffs off and see if you tough." [*Id.* at 5:40]. At Good Samaritan, Leath refused to comply and actively resisted the blood pressure, pulse, and heart rate monitoring. [DE 37-20]. At one point he told police "I'll kick you in your motherfucking face." [*Id.* at 13:10]. Police then warned Leath "kick one of us, and you will be charged with assault." [*Id.* at 13:40]. As the struggle continued, police told Leath to stop fighting and they put him on the ground. During the video, Officer Duncan yelled that Leath bit him, and Leath exclaimed, "I'm about

ready to act a fool up in this motherfucker." [*Id.* at 15:06].
Leath then prompted officers to break his neck: "I want you to
hurt me . . . so I get paid." [*Id.* at 15:19]. And toward the end
of the incident, Leath told officers to "put my shit on before I
kick your motherfucking. . ." [DE 37-23 at 4:15].

The video is clear: a non-complaint, resisting Leath made
numerous threats to officers. Indeed, the *only* reason police
touched Leath at all was because he resisted. On top of that,
Leath had already suggested he had "bodies under [his] belt," and
he challenged officers to take off his handcuffs. Taken together,
Leath exhibited multiple "outward manifestation[s]" both "verbal
and physical" that suggested "volitional and conscious defiance."
*Eldridge*, 533 F. App'x at 534. Handcuffs did not extinguish this
reality. After all, "[f]eet, too, can be weapons." *Youngblood v.
Wood*, 41 F. App'x 894, 898 (7th Cir. 2002). And here police
believed Leath was trying to use his feet—and his mouth—as weapons.
Leath in fact threatened to kick officers. Given Leath's active
resistance and the threat he posed, officers had reason to apply
force. That force did not include strikes, kicks, Tasers, batons,
guns, or chokeholds. Instead, Leath rests his argument on the
fact that he was in handcuffs and officers were not in danger.
But thrashing, non-compliant suspects already in custody can pose
threats to officers and can be resisting arrest. That is what
occurred here.

Indeed, the video tells the story and removes any genuine dispute as to any material fact. *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir. 2012). Considering "the circumstances [officers] faced at the time [they] decided to use the force," the officers' actions were reasonable. *Thomas*, 854 F.3d at 365. Thus, the Court finds no constitutional violation.

And in the absence of finding a constitutional violation, the Court cannot conclude that officers violated any clearly established rights. Leath "has not pointed [the Court] to any caselaw that demonstrates a prior articulation of a prohibition against the type of force exerted against him." *Estate of Hill v. Miracle*, 853 F.3d 306, 316 (6th Cir. 2017).

Defendants' Motion for Summary Judgment on Count III is **GRANTED** for the alleged excessive forced used at Good Samaritan Hospital.

### *(ii) Assault and Battery*

Leath claims Webb's throat grab and the incident at Good Samaritan also amount to assault (Count IV) and battery (Count V) under state law. As an initial matter, the Court notes that in Kentucky "assault and battery are two distinct and independent legal claims." *Ali v. City of Louisville*, No. 3:05CV-427-R, 2006 WL 2663018, at *4 n.7 (W.D. Ky. Sept. 15, 2006). "Assault is a tort which merely requires the threat of unwanted touching of the

victim, while battery requires an actual unwanted touching." *Banks v. Fritisch*, 39 S.W.3d 474, 480 (Ky. Ct. App. 2001). Battery under Kentucky law is any "unlawful touching of the person of another, either by the aggressor himself, or by any substance set in motion by him." *Vitale v. Henchey*, 24 S.W.3d 651, 657 (Ky. 2000). "The use of excessive force by a police officer constitutes the intentional tort of battery." *Ali*, 2006 WL 2663018, at *8.

Here, defendants argue that Kentucky's qualified immunity doctrine shields officers from state-law liability. [DE 37, pp. 27-28]. Leath argues only that Defendants' arguments against the state-law claims "fail for the same reason as their federal law arguments." [DE 41, p. 33]. But "the analysis of excessive force claims under § 1983 is different from the analysis under state law" in Kentucky. *Coitrone v. Murray*, 642 F. App'x 517, 524 (6th Cir. 2016). So the Court must consider whether state qualified immunity shields officers.

Qualified immunity in Kentucky protects officers from liability for "good faith judgment calls made in a legally uncertain environment." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001). Public employees enjoy qualified official immunity for (1) discretionary acts (2) performed in good faith and (3) within the employee's scope of authority. *Id.* Actions taken within the scope of one's authority as a police officer constitute discretionary

acts. *See Woosley v. City of Paris*, 591 F.Supp.2d 913, 922 (E.D. Ky. 2008). Bad faith stems from objective unreasonableness or willful or malicious intent to harm the plaintiff. *Yanero*, 65 S.W.3d at 523. Objective unreasonableness occurs when the officer violates the plaintiff's clearly established right that a person in the officer's position would have known. *Id*. "Once the officer or employee has shown *prima facie* that the act was performed within the scope of his/her discretionary authority, the burden shifts to the plaintiff to establish by direct or circumstantial evidence that the discretionary act was not performed in good faith." *Id*.

Here, Leath's state-law claims against Webb for the throat grab survive, but his claims related to the Good Samaritan commotion fail.

The Webb claims survive because an officer may use only the amount of force that the officer reasonably believes is necessary, but no more. *See City of Lexington v. Gray*, 499 S.W.2d 72, 74 (Ky. Ct. App. 1973). The body camera video and Webb's comments create a genuine dispute as to whether Webb used more force than was reasonably necessary during the arrest. *See Gordon v. Jones*, No. 3:08CV-P460-S, 2011 WL 847926, at *6 (W.D. Ky. Mar. 8, 2011).

But officials are entitled to state qualified immunity for restraining Leath at Good Samaritan because Leath cannot show bad faith—a burden Leath must bear. *See Yanero*, 65 S.W.3d at 523.

This requires malicious intent or a violation of plaintiff's clearly established rights. *Id*. As in the context of his federal claim, Leath demonstrates neither here because restraining a detainee to take blood pressure, pulse, and temperature does not violate his clearly established rights. Thus state qualified immunity bars these claims.

Defendant's Motion for Summary Judgment is **DENIED** as to Count IV and Count V against Webb for the alleged throat grab and **GRANTED** against Defendants for the incident at Good Samaritan.

### E. Group Four: Violation of Free Speech

Count X alleges a violation of Leath's Right to Free Speech against officers Webb, Duncan, and McConnell. [DE 41, p. 4]. Leath claims the officers retaliated against him for exercising his free speech rights by (1) "taking him to Good Samaritan hospital where they held him down and forced him to receive medical care to which he did not consent, and (2) bringing false felony charges against him." [*Id*.].

This claim is premised on the idea that officers retaliated against Leath for refusing to consent to the taking of his vital signs. Leath argues "he was retaliated against for refusing to consent to an examination at the jail and again at Good Samaritan." [DE 41, p 34]. Leath claims that officers invented the felony assault charges because of this refusal.

A retaliation claim involves three elements: "(1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by the plaintiff's protected conduct." *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (en banc). And "[a]bsent protected conduct, plaintiffs cannot establish a constitutional violation." *Id*. at 395. The plaintiff has the burden of "establishing that his protected conduct was a motivating factor behind any harm." *Id*. at 399.

In his response to Defendants' Motion for Summary Judgment, Leath clarifies that his protected conduct was "refusing to consent to an examination at the jail and again at Good Samaritan." [DE 41, p. 34]. But as the Court has already explained, a detainee like Leath has no clearly established right to refuse the taking of his vital signs. And since his refusal was not protected conduct, officers could not have retaliated against him.

In addition, there is no evidence that officers invented the felony assault charges to retaliate against Leath. To the contrary, as discussed above, officers immediately claimed that Leath bit and kicked them at Good Samaritan. And Leath himself threatened to kick officers and claimed he was "ready to act a

fool." A grand jury also found probable cause on these charges, suggesting the officers had a legitimate reason for filing the charges. True, probable cause does not always defeat a retaliation claim, *see Lozman v. City of Riviera Beach*, 138 S.Ct. 1945 (2018), but "[g]uilt of misconduct may be relevant summary judgment evidence." *Maben v. Thelen*, 887 F.3d 252, 262 (6th Cir. 2018). And here evidence of misconduct—including a grand-jury indictment— supports a legitimate basis for the felony charges.

Defendants' Motion for Summary Judgment as to Count X is **GRANTED**.

### IV. Conclusion

Two-and-a-half years ago, Leath promised he'd sue UKPD. He claimed from the beginning that officers and nurses violated his federal and state rights. Yet for the most part, Leath fails to overcome qualified immunity or fails to establish necessary elements of his claims. On those counts, there is no genuine dispute as to any material fact and no need for trial.

But that's not true on all claims. Leath can still pursue his excessive force (Count III), assault (Count IV), and battery (Count V) claims against Officer Webb. Accordingly, **IT IS ORDERED:**

(1)   that Defendants' Motion for Summary Judgment [DE 37] is

      **DENIED** as to Counts III, IV, and V against Officer Webb

      for the alleged throat grab**;**

(2)   that on all other counts, Defendants' Motion for Summary

      Judgment [DE 37] is **GRANTED**.

This the 29th day of June, 2018.

Signed By:

*Joseph M. Hood*

Senior U.S. District Judge